**DISTRICT OF OREGON**
**F I L E D**
**December 31, 2024**
**Clerk, U.S. Bankruptcy Court**

Below is an opinion of the court.

*Teresa H. Pearson*
_____
TERESA H. PEARSON
U.S. Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| In re | Case No. 21-31597-thp7 |
| Que Phung Thi Nguyen, | |
| Debtor. | |
| Donna Tran and Bruce Tran, | Adv. Proc. No. 21-03049-thp |
| Plaintiffs, | |
| v. | MEMORANDUM DECISION[1] |
| Que Phung Thi Nguyen, | |
| Defendant. | |

### **Introduction**

This adversary proceeding came before the court for trial on December 9 and 10, 2024. Plaintiffs appeared through their counsel Kenton Hutcherson and Tony Kullen. Defendant appeared through her counsel Rex Daines. Each of the parties attended trial and testified.

---

[1] This disposition is specific to this case. It may be cited for whatever persuasive value it may have.

Plaintiffs also read deposition testimony from Hoc Van Huynh and Que Minh Thi Nguyen into the record.  Exhibits 1-4, 17-25, 36, 51, 60, and 66-67 were admitted without objection.

For the reasons set forth below, this court finds in favor of defendant on the claims plaintiffs presented at trial.

### Procedural History

Debtor filed her voluntary chapter 7 case on July 21, 2021.[2]  Plaintiffs timely filed this adversary proceeding, asserting claims under 11 U.S.C. §§ 523(a)(2)(A), (a)(4), and (a)(6) and objecting to debtor's discharge under 11 U.S.C. §§ 727(a)(2), (a)(3), (a)(4), and (a)(5), as well as asserting claims under California state law for intentional infliction of emotional distress, to set aside and return community property, and for civil extortion.[3]  Debtor filed her answer denying most of plaintiffs' factual allegations, and asserting affirmative defenses.[4]

The court granted relief from stay so plaintiffs could pursue an appeal in the California appellate courts on the viability of some of their underlying state law claims.[5]  On November 28, 2023, the California Court of Appeal issued its decision holding that California law allows Mr. Tran to bring a claim for rescission of payments allegedly made based on extortion as a civil contract claim (but not as a tort claim), and that California law does not allow plaintiffs to bring claims for intentional infliction of emotional distress under the circumstances of this case.[6]  On March 12, 2024, the California Supreme Court denied further review.[7]

On May 6, 2024, plaintiffs filed their first amended complaint in this case to address the decisions of the California courts.[8]  Plaintiffs continued to assert claims under 11 U.S.C. §§ 523(a)(2)(A), (a)(4), and (a)(6) and to object to debtor's discharge under 11 U.S.C.

---

[2] ECF No. 1, filed in case no. 21-31597-thp7 on July 21, 2021.
[3] ECF No. 1, filed Oct. 18, 2021.
[4] ECF No. 8, filed Nov. 15, 2021.
[5] ECF No. 29, entered Jan. 25, 2022.
[6] *Tran v. Nguyen*, 97 Cal. App. 5th 523, 315 Cal. Rptr. 3d 607 (2023), *reh'g denied* (Dec. 19, 2023), *rev. denied* (Mar. 12, 2024).
[7] *Id.*
[8] ECF No. 82, filed May 6, 2024.

§§ 727(a)(2), (a)(3), (a)(4), and (a)(5).  Plaintiffs also asserted state law claims to set aside community property gifts and transfers, for civil extortion, for conversion, to establish a constructive trust, and for receiving stolen or extorted property.  Debtor did not file an answer to the first amended complaint.[9]

Before trial, plaintiffs filed a motion for summary judgment.[10]  The court granted the motion for summary judgment on plaintiffs' claims under 11 U.S.C. §§ 727(a)(3) and 727(a)(5), and on defendant's affirmative defenses of unclean hands and the Rooker-Feldman Doctrine. [11] The court granted in part plaintiffs' motion for summary judgment on debtor's affirmative defense of issue preclusion. [12]  The court denied the motion for summary judgment on plaintiffs' claims for conversion, constructive trust, and civil extortion.[13]  The court has not entered any judgment under Fed. R. Civ. P. 54(b), made applicable Fed. R. Bankr. P. 7054.

Because the court had already granted summary judgment to plaintiffs on claims under 11 U.S.C. §§ 727(a)(3) and 727(a)(5), plaintiffs elected not to proceed at trial with their claims under 11 U.S.C. §§ 727(a)(2) and 727(a)(4).  Plaintiffs went to trial on their remaining claims.

## **Jurisdiction**

This court has jurisdiction of this adversary proceeding under 28 U.S.C. § 1334, and authority to decide these claims as core proceedings under 28 U.S.C. § 157(b)(2)(I).  A bankruptcy court has jurisdiction to enter money judgments on state law claims in conjunction with finding that those obligations are nondischargeable.[14]  There is no dispute that the court had jurisdiction at the outset of this case.[15]

---

[9] *See* Docket, 21-03049-thp.
[10] ECF No. 85, filed Oct. 31, 2024.
[11] Memorandum Decision re Plaintiffs' Motion for Summary Judgment, ECF No. 97, entered Dec. 3, 2024; Order re Plaintiffs' Motion for Summary Judgment, ECF No. 98, entered Dec. 3, 2024.
[12] *Id.*
[13] *Id.*
[14] *Deitz v. Ford (In re Deitz)*, 760 F.3d 1038, 1050 (9th Cir. 2014); *Cowen v. Kennedy (In re Kennedy)*, 108 F.3d 1015, 1017-18 (9th Cir. 1997), as amended (Mar. 21, 1997).
[15] Complaint, ¶ 2, ECF No. 1, filed Oct. 18, 2021; Answer, ¶ 1, ECF No. 8, filed Nov. 15, 2021.

At the beginning of trial, defendant argued that the court no longer had jurisdiction and this case should not go forward because the court already granted summary judgment to deny defendants' discharge under 11 U.S.C. §§ 727(a)(3) and 727(a)(5). Plaintiffs opposed defendant's position, asserting that the court had jurisdiction and could proceed to decide the remaining claims in this case. Ultimately, this is a question of mootness.

At trial, the court held that this matter was not moot and that the court retained jurisdiction even after granting summary judgment denying defendant's discharge.[16] This court finds persuasive cases involving retention of jurisdiction after the underlying bankruptcy case has been dismissed.[17] These cases suggest that the court should consider economy, convenience, fairness, and comity in deciding whether to retain jurisdiction over an issue in the main case or adversary proceeding after a bankruptcy case has been dismissed.[18] This case has been pending for three years, involved extensive discovery and motion practice in the bankruptcy court, and was ready for trial. It would make no sense to return the state law claims to state court, where trial would be further delayed. This court already accommodated concerns regarding comity by allowing the appeal to the California appellate courts to proceed concomitantly with this proceeding, and following the California courts' rulings regarding California law. Therefore, for reasons of judicial economy, convenience, fairness, and comity, the court concluded that it was appropriate for the court to retain jurisdiction and try this case promptly.

After trial, this court became aware of authority from the Ninth Circuit Court of Appeals specifically addressing mootness of an adversary proceeding for nondischargeability of a debt

---

[16] Although the court ruled orally on this issue at trial, the court includes this issue in its written ruling for clarity in the record and to provide a more fulsome explanation for its ruling.

[17] *See Shop Television Network, Inc. v. Chodos (In re Shop Television Network, Inc.)*, 79 F.3d 1154, 1996 WL 102580 (Table), *1-2 (9th Cir. 1996) (upholding bankruptcy court's decision to retain jurisdiction over dispute even after bankruptcy case was dismissed); *Carraher v. Morgan Elecs., Inc. (In re Carraher)*, 971 F.2d 327, 328 (9th Cir. 1992) (same); *Linkway Inv. Co. v. Olsen (In re Casamont Invs., Ltd.)*, 196 B.R. 517, 523-25 (9th Cir. BAP 1996) (applying *Carraher* but finding that the *Carraher* factors did not support retention of jurisdiction).

[18] *Id.*

after denial of discharge.[19]  In *Burrell*, a creditor brought claims in an adversary proceeding

asserting that certain debts should not be dischargeable under 11 U.S.C. § 523.[20]  After the

bankruptcy court ruled against the creditor, he appealed.[21]  While the case was pending in the

district court, but before the district court issued its ruling, the bankruptcy court entered a final

judgment, in another separate adversary proceeding brought by the trustee, denying debtor's

discharge under 11 U.S.C. § 727(a)(10).[22]  The district court later affirmed the bankruptcy

court's original ruling against the creditor.[23]  The creditor then appealed the adverse ruling from

the district court to the Ninth Circuit Court of Appeals.[24]  The Court of Appeals held that the

case was moot because it could not provide the creditor with any more relief than he had already

received from the denial of debtor's discharge.[25]  The creditor sought to have his claims treated

as though they included a request for declaratory judgment, and therefore would not be moot, but

the Court of Appeals was unwilling to issue declaratory judgment when the actual claims

asserted were moot.[26]

---

[19] *Pilate v. Burrell (In re Burrell)*, 415 F.3d. 994 (9th Cir. 2005).  None of the parties cited this case at trial.

[20] *Id.* at 996.

[21] *Id.*

[22] The Ninth Circuit Court of Appeals' opinion states that "On April *24*, 2002, less than a month before the district court entered its order of judgment, the bankruptcy court entered an *order* denying the discharge of the debtors on other grounds."  *Id.* at 997.  In fact, a close review of the relevant docket shows that the bankruptcy court entered a *judgment* denying debtor's discharge on April *23*, 2002.  *Broach v. Burrell (In re Burrell)*, Ch. 7 Case No. 96-42564, Adv. No. 99-04209, ECF No. 32, entered Apr. 23, 2002 (Bankr. N.D. Cal. 2002).  This judgment was not appealed.  Under the Federal Rules of Bankruptcy Procedure in effect at that time, which required that a notice of appeal be filed within 10 days after entry of judgment, this judgment became final and non-appealable on May 4, 2002.  Fed. R. Bankr. P. 8002(a) (West 2002) (amended 2009) (changing ten-day periods to fourteen-day periods).  This judgment was final and non-appealable before the district court entered its judgment affirming the decision against the creditor in the bankruptcy court.  *Pilate v. Burrell*, Case No. 3:02-cv-02657-WHA, ECF No. 30, entered May 21, 2002 (N.D. Cal. June 25, 2002).

[23] *Burrell*, 415 F.3d at 996

[24] *Id.*

[25] *Id.* at 998.

[26] *Id.*

This case is distinguishable from *Burrell*.  First, there are remaining unresolved stand-alone claims in this case on which this court can grant effective relief.  The Trans asserted state law claims to establish the amount of the debt they claim Ms. Nguyen owes them.  There is still a live controversy between plaintiffs and the defendant regarding the merits of those claims.  These were not requests for declaratory relief buried in other claims, but separately stated independent claims for monetary damages.  Second, this court has not yet entered final judgment denying the debtor's discharge.  To the extent that debtor appeals, and the court's decision granting summary judgment on plaintiffs' claims for denial of debtor's discharge under 11 U.S.C. §§ 727(a)(3) and 727(a)(5) might be overturned or vacated on appeal, this court still could provide effective relief on the claims for nondischargeability under 11 U.S.C. § 523.  Judicial economy favors resolving all the issues on the merits in one trial at one time to the extent possible, so any appellate issues can be resolved in one proceeding rather than piecemeal.

### Facts

This case is fact intensive and many of the facts were disputed.  After carefully considering all the evidence presented as a whole and the credibility of each of the witnesses,[27] the court makes the following findings of fact:

**Relationships Between the Parties**

1.    Mr. and Mrs. Tran are each from Vietnam.  Mr. Tran moved to the United States in 1973.  Mrs. Tran moved to the United States in 2000.

---

[27] The nature of this case was very personal and emotional.  While the court believed no witness was entirely credible, it also did not believe that any witness was entirely not credible.  In finding these facts, this court considered all the testimony and documents presented and weighed evidence in context to determine which portions of the testimony the court found to be credible. There were many facts stated by one witness that were directly contradicted by another witness or other admitted evidence.  These findings of fact reflect that the court believed the witness or evidence that supported these facts and disbelieved the contrary testimony.  However, notwithstanding the foregoing, and for clarity in the record, this court gave no weight to the testimony regarding a lawsuit in federal district court filed against Mr. Tran and/or his company. It was undisputed that the jury's verdict in that case was subject to pending posttrial motions. Because the issues in that case remain unresolved, the court did not find the information presented about that case to be relevant or useful in deciding this matter.

2.      Mr. and Mrs. Tran met while they were in college at Portland State University in Oregon in 2000.

3.      Mr. and Mrs. Tran married in 2003.  They have two children, a son born in 2002 and a daughter born in 2004.

4.      Mr. Tran is the CEO of a software business.  Mrs. Tran was a stay-at-home parent.

5.      When their son was born, Mrs. Tran suffered from depression.  That depression became more severe in 2010.

6.      Mr. and Mrs. Tran separated in 2010.

7.      Ms. Nguyen is also from Vietnam.  In February 2011, Mr. Tran met Ms. Nguyen at a coffee shop in Beaverton, Oregon, where Ms. Nguyen was studying.  A few months later, Mr. Tran and Ms. Nguyen commenced an intimate relationship.

8.      Mr. Tran was concerned that Mrs. Tran would be very upset and would try to harm herself if she found out about the affair.

9.      In May 2011, Ms. Nguyen told Mr. Tran that she was pregnant.  Mr. Tran acknowledged that he would need to play a role in the child's life and encouraged Ms. Nguyen to remain in school.

10.     In February 2012, Ms. Nguyen gave birth to a son (the "Child"), who was given Mr. Tran's last name.  Mr. Tran was present at the birth.

11.     Based on voluminous photographs admitted as exhibits to the court, Mr. Tran apparently acknowledged the Child as his own and participated in various family activities with Ms. Nguyen and the Child for many years.

12.     Between October 2011 and early 2012, Mr. and Mrs. Tran reconciled their marriage.  However, Mr. Tran did not disclose to Mrs. Tran his continuing relationship with Ms. Nguyen or the existence of the Child.

13.     At some point, Mr. Tran decided that he would not leave his family with Mrs. Tran to be with Ms. Nguyen and the Child.

14.     Mr. Tran and Ms. Nguyen continued to have an intimate relationship until 2015 or 2016.

**Financial Problems for Mr. Tran and His Company**

15.     In 2014, Mr. Tran's business was doing well.

16.     In 2015, Mr. Tran's business decreased, and Mr. Tran's income went down. Some of the employees at Mr. Tran's company left.

17.     Payroll was the biggest financial burden for Mr. Tran's company.  Payroll taxes were a significant obligation.

18.     In 2015, the Internal Revenue Service audited Mr. Tran and his company for the tax year 2013.  Later, the Internal Revenue Service added tax year 2014 to the audit.  The Internal Revenue Service performed a desk audit for tax year 2015.  These audits resulted in significant tax liabilities with large amounts of interest and penalties due.

19.     The Internal Revenue Service engaged in collection activity.  To avoid the Internal Revenue Service liquidating all his assets, Mr. Tran agreed to sell some fixed assets and proposed a plan for payment.  Mr. Tran made payments to the Internal Revenue Service and, while it took time, substantially performed on this plan.

20.     Mr. Tran also had problems with taxes owed to the Oregon Department of Revenue.

21.     As a result of the decline in business and tax problems, Mr. Tran was under a great deal of financial strain.

22.     Mr. Tran managed the money for his family with Mrs. Tran.  Mrs. Tran did not review bank records for the family.  Mr. Tran told Mrs. Tran about the problems with the Internal Revenue Service.

23.     The financial problems were so significant and stressful that in 2016 Mr. Tran attempted suicide by driving his car into a tree.  Mrs. Tran was aware of Mr. Tran's suicide attempt.

24.     Mr. Tran liquidated a joint account he and Mrs. Tran had at Merrill Lynch. Mr. Tran borrowed from his 401(k) plan and withdrew the funds from his and Mrs. Tran's children's Section 529 college savings plan.  Mr. Tran took out a home equity loan, and he borrowed money from a hard money lender.

25.     By 2018, Mr. Tran was unable to pay many of his regular household bills.  He did not pay his mortgage for three months.  He did not pay the private school tuition for his children with Mrs. Tran.  Mr. Tran's car insurance was cancelled for nonpayment.

26.     Mrs. Tran became aware of the family's severe financial distress when the school tuition and the insurance were not paid.  Mrs. Tran was upset when she learned the Section 529 college savings plan money was withdrawn from the account for their children.

**The Facebook Account**

27.     Ms. Nguyen maintained a Facebook account in the Child's name that contained numerous photographs of the Child, Ms. Nguyen, Mr. Tran, and others.  Ms. Nguyen started the account so that she could share photographs and family updates with her family in Vietnam.

28.     The Facebook account was sometimes private and sometimes public. Ms. Nguyen made the account public so it would be easier for Ms. Nguyen's relatives in Vietnam to find online.

29.     In 2017, Mr. Tran found the Child's Facebook account online.  Mr. Tran was concerned about the account because Mrs. Tran was active on Facebook.  He was worried the account could cause "drama and trauma."

30.     Mr. Tran emailed Ms. Nguyen to ask her to make the account private and to remove his photographs from the account.

31.     Neither Mr. Tran nor Ms. Nguyen remembered if the account was made private at that time.  Ms. Nguyen did not remember if she removed any photographs.

32.     On December 25, 2018, the Child's Facebook account was public.

33.     In approximately February 2019, Ms. Nguyen deleted the Child's Facebook account.

**Ms. Nguyen Discloses the Child and her Relationship with Mr. Tran to Mrs. Tran**

34.     On January 8, 2019, Ms. Nguyen sent an email to Mrs. Tran, using the alias name of Tina Duong.  The email said that if Mrs. Tran wanted to know the truth about her husband, she should go on Facebook and search for the Child's name.

35.     Upon receiving the email, Mrs. Tran went to Facebook and found the Child's Facebook account, including numerous pictures of Mr. Tran, Ms. Nguyen, and the Child.  There were over 1,000 pictures on the Facebook account.

36.     Prior to this time, Mrs. Tran had no knowledge of the affair or the Child.

37.     Mrs. Tran suffered a great deal of distress after receiving the email and learning about Mr. Tran's affair with Ms. Nguyen and the existence of the Child.

38.     The disclosure of the affair and the Child to Mrs. Tran occurred shortly before Tet, the Vietnamese Lunar New Year, which is an important holiday for Mrs. Tran and a major holiday in Vietnamese culture.  The timing of the disclosure added to Mrs. Tran's distress.

39.     In 2019, Mrs. Tran suffered from nightmares, weight loss, and suicidal thoughts.

40.     After learning of the affair, Mrs. Tran attempted suicide six times.  Ultimately, she received medical treatment that helped.

41.     Mrs. Tran did not approve any payment or support for Ms. Nguyen or the Child, at any time before or after she learned of the affair and the Child.

**Non-Cash Transactions Between Mr. Tran and Ms. Nguyen**

42.     While Ms. Nguyen was pregnant, Mr. Tran purchased land in Oregon and built a house on it.  In April 2013, Ms. Nguyen and the Child moved into the house.  In August 2013, Ms. Nguyen and the Child moved out of the house and into a rented apartment.  Ms. Nguyen moved out of the house because she believed that Mr. Tran was not willing to leave his wife to be with her and that it would be better for her to live on her own with the Child.

43.     In 2012, Mr. Tran purchased a BMW X3 that he provided to Ms. Nguyen for her use.  He purchased the BMW using a 60-month loan.  As of April 21, 2017, the BMW was titled

in Oregon in Mr. Tran's name at Mr. Tran's Oregon address.  In October 2018, Mr. Tran transferred title to the BMW to Ms. Nguyen.

44.    Mr. Tran paid for airplane tickets for Ms. Nguyen and the Child to travel to Vietnam and to Hawaii.

45.    Mr. Tran made payments towards Ms. Nguyen's student loans.  Mr. Tran testified that these payments were made by debit from Mr. Tran's bank account to the student loan bank lender.  Mr. Tran testified this was more than $80,000, but he had no records showing this because his bank account records did not go back that far.  Ms. Nguyen testified that Mr. Tran paid about $20,000 toward her student loans using a credit card.

46.    Mr. Tran provided some diapers, formula, food, clothing, and toys for the Child.[28] Mr. Tran also provided health insurance for Ms. Nguyen and the Child, which stopped in 2017 or 2018.[29]

47.    In 2017, Mr. Tran made a $6,000 birthday gift to the Child.

48.    Throughout most of the Child's life, Ms. Nguyen did not seek a court order for Mr. Tran to pay child support.

49.    In 2018, that changed.  In April or May of 2018, Ms. Nguyen filed to request a court order for child support.

50.    Mr. Tran did not want an outstanding court order for child support.  He discussed making a voluntary child support arrangement with Ms. Nguyen instead.

51.    In August 2018, Mr. Tran had an attorney prepare an agreement regarding child support.  The agreement provided that in exchange for Mr. Tran voluntarily paying child support for the Child, Ms. Nguyen would keep information about herself and the Child confidential from Mrs. Tran.

52.    From April 2018 through December 2018, Mr. Tran paid $11,000 in child support to Ms. Nguyen.

---

[28] In addition to the trial testimony, see Exhibit 67, pp. 69-76.
[29] *Id.*

53.　　Ms. Nguyen admitted that Mr. Tran provided some funds to her to support the child by depositing them as "counter credit" at her bank.

54.　　Due to his financial problems, Mr. Tran had difficulty making the agreed child support payments and did not fully make them.

55.　　In 2019, Ms. Nguyen obtained a court order requiring Mr. Tran to pay child support.

56.　　Presently, Mr. Tran pays $1,644 per month in child support.

**The Alleged Cash Payments**

57.　　Mr. Tran testified that Ms. Nguyen would repeatedly ask for money from him, and that he believed she was extorting him because Ms. Nguyen knew that Mr. Tran did not want Mrs. Tran to find out about the affair and the Child.

58.　　Between August 2014 and December 2018, Mr. Tran withdrew large amounts of money in cash in both Oregon and California from the account he owned jointly with Mrs. Tran. Mr. Tran testified that when he withdrew cash in California, he transported the cash to Oregon.

59.　　Mr. Tran testified that of the amounts he withdrew, he paid $500,500 to Ms. Nguyen in cash, calling her and meeting her in parking lots to transfer the cash to her. Mr. Tran further testified that he paid $55,218.15 in cash to others on behalf of Ms. Nguyen.

60.　　Mr. Tran testified that, other than for payments to or on behalf of Ms. Nguyen, he never uses cash at all—he uses credit cards.

61.　　Mr. Tran did not tell Mrs. Tran that he gave money to Ms. Nguyen until two weeks after Mrs. Tran received the January 8, 2019, email from Ms. Nguyen. This information further upset Mrs. Tran.

62.　　Ms. Nguyen testified that she asked for support and assistance from Mr. Tran—to take care of the Child so she could complete school—but denies that she extorted him.

63.　　Ms. Nguyen testified at trial that she did not receive any of the alleged cash payments from Mr. Tran.

64.     The court finds Ms. Nguyen, and not Mr. Tran, credible regarding the alleged cash payments.  The court expressly finds that Ms. Nguyen did not extort funds from Mr. Tran and that Mr. Tran did not make these alleged cash payments to Ms. Nguyen.

**The Trans' Domicile**

65.     In 2011, Mr. and Mrs. Tran were living full time in Oregon.

66.     Mr. and Mrs. Trans' two children were in private school in Oregon from 2011[30] through the end of the school year in June 2018.  Their school year ran from September through June.  In the fall of 2018, the children started the next school year in California.

67.     From 2012 to 2018 Mr. and Mrs. Tran owned real estate in both Oregon and California.  Mr. and Mrs. Tran purchased a house in California in 2012, which they furnished, including with family photos.  They also maintained their house in Oregon.  They lived in both Oregon and California.

68.     Mrs. Tran testified that, after 2012, the family lived 50 percent of their time in Oregon and 50 percent of their time in California, intending to reside permanently in California after the children turned 14.  Mr. and Mrs. Tran's youngest child turned 14 in 2018.

69.     In 2018, Mrs. Tran left Oregon and did not return.  Mr. and Mrs. Trans' children attended school from and after fall of 2018 in California.

70.     Mr. Tran's software business is an S corporation.  It has operations in both Oregon and California.

71.     Mr. Tran had significant income and payroll tax obligations to both the Internal Revenue Service and the Oregon Department of Revenue.  Mr. Tran did not testify regarding owing any income taxes to the State of California.

72.     Mr. Tran paid California property taxes from 2012 to 2018.

---

[30] Mr. and Mrs. Tran's son started school later than the traditional age and was not in school prior to 2011.

73.     Mr. and Mrs. Tran had a joint bank account.  The bank account statements for August 2014 through July 2018 were addressed to them in Portland, Oregon.[31]  In August 2018, the address on the account was changed to one in Huntington Beach, California.

74.     In 2019, Mr. and Mrs. Tran became new patients with a doctor in California.  At the time, Mr. Tran told his doctor he was moving his business to California from Portland, Oregon.

75.     Mrs. Tran presently has an Oregon drivers' license.  Mrs. Tran tried to obtain a California drivers' license but was unsuccessful on the test.  Because of COVID, she was unable to take the test again.

76.     From the facts set forth above, the court concludes that Mr. and Mrs. Tran lived primarily in Oregon, with an intent to remain in Oregon, until the summer of 2018, at which time they moved to California.

In addition to these general facts, additional findings of fact are set forth in the discussion of specific legal claims.

## Analysis of Claims

### A.  Claim to Set Aside Community Property Gifts and Transfers

Mrs. Tran asserts a claim to set aside all gifts of community property that Mr. Tran made to Ms. Nguyen, pursuant to California Family Code Section 1100(b).  The court holds that Mrs. Tran has not proven her claim.

California is a community property state.  Under California law, all property acquired by a married person during the marriage while domiciled in California is community property.[32]  Therefore, if the Trans were domiciled in California during and after 2012, the BMW X3 and the joint bank account would be community property, regardless of how they were titled or held.  Under California Family Code Section 1100(b) "[a] spouse may not make a gift of community

---

[31] Account statements prior to August 2014 were not available.

[32] Cal. Fam. Code § 760 (West).  ("Except as otherwise provided by statute, all property, real or personal, wherever situated, acquired by a married person during the marriage while domiciled in this state is community property.")

personal property, or dispose of community personal property for less than fair and reasonable value, without the written consent of the other spouse." If a spouse does so, California provides the non-consenting spouse with a cause of action to invalidate and recover the gift or transfer in its entirety.[33]

Oregon is not a community property state. Oregon had a community property law briefly in the 1940s but it was repealed.[34] Since the repeal of that law, "any third person may rely, and shall be fully protected in relying, upon the right of either spouse in a marriage to receive, manage, control, dispose of or otherwise deal with property standing in that spouse's name in such manner as the spouse is entitled to by law."[35] The BMW X3 was titled in Mr. Tran's name before he conveyed it to Ms. Nguyen. Under Oregon law, a joint bank account belongs "to the parties in proportion to the net contributions by each to the sums on deposit, unless there is clear and convincing evidence of a different intent."[36] In this case, Mr. Tran owned a business and was earning an income. Mrs. Tran was a stay-at-home parent. From those facts, the court infers that the source of the funds in the bank account were from Mr. Tran. No evidence was presented regarding any other source of the funds in the bank account or regarding the Trans' intent regarding ownership of the bank account. Therefore, if the Trans were domiciled in Oregon during and after 2012, under Oregon law the BMW X3 and the funds in the joint bank account would belong to Mr. Tran. Ms. Nguyen could accept the BMW X3 and financial support from Mr. Tran without concern about a claim from Mrs. Tran.

Because the law is different in the two states, it matters whether the Trans were domiciled in California or Oregon, and when. Mrs. Tran can only have a claim to set aside the transfer of

---

[33] *Lezine v. Sec. Pac. Fin. Servs., Inc.*, 14 Cal. 4th 56, 59, 66-67, 925 P.2d 1002, 1003, 1008 (1996) (interpreting former Section 5127 of the California Civil Code, which was repealed and reenacted without substantive change as California Family Code Section 1102.)

[34] Oregon Community Property Law of 1943, ch. 440, 1943 Or. Laws 656 (repealed 1945) (reenacted by Act of July 5, 1947, ch. 525, 1947 Or. Laws 910 (repealed 1949)). For more information about this law, *see* Philip B. Lowry & William J. Robert, The Oregon Community Property Law (Oregon State Bar, 1947)

[35] Or. Rev. Stat. § 108.550.

[36] Or. Rev. Stat. § 708A.465.

community property if the Trans owned community property and Mr. Tran transferred that community property to Ms. Nguyen.  For any time that the Trans were domiciled in Oregon before becoming domiciled in California, their property was not community property and there could be no liability under California Family Code Section 1100(b) for transferring that property.

California treats a domicile as the location where a person has "the most settled and permanent connection, the place where he intends to remain and to which, whenever he is absent, he has the intention of returning, but which the law may also assign to him constructively; whereas 'residence' connotes any factual place of abode of some permanency, more than a mere temporary sojourn."[37]  A person can have more than one residence but only one domicile.[38]

In Oregon, domicile is determined by considering all the facts and circumstances of the case, including, among other things, how much time a person spends in a place and with whom, where a person files taxes, and where a person has a driver's license.[39]  Domicile requires that a party has a present intent to make a state their home, not the intent to make that state their home in the future.[40]  For a change in domicile, Oregon law requires "(1) residence in another place, (2) an intention to abandon the old domicil, and (3) an intention to acquire a new domicil."[41]

The court concludes, based on the facts of this case, that from their marriage in 2003 to the summer of 2018, Mr. and Mrs. Tran were domiciled in Oregon.  There was no evidence that Mr. and Mrs. Tran lived anywhere other than Oregon from the time they met in college at Portland State University through 2011.  Although Mr. and Mrs. Tran acquired a house in California in 2012, the court is not persuaded that between 2012 and the summer of 2018, under Oregon law, Mr. and Mrs. Tran had a present intent to abandon their domicile in Oregon and

---

[37] *Smith v. Smith*, 45 Cal. 2d 235, 239, 288 P.2d 497 (1955).
[38] *Id.*
[39] *Elwert v. Elwert*, 196 Or. 256, 264-71, 248 P.2d 847, 851-54 (1952); *Zimmerman v. Zimmerman*, 175 Or. 585, 591-92, 155 P.2d 293, 296 (1945) (reciting list of factors to consider in determining domicile).
[40] *Elwert*, 196 Or. at 265-66, 248 P.2d at 851.
[41] *Elwert*, 196 Or. at 265, 248 P.2d at 851.

make California their home.  At most, Mr. and Mrs. Tran intended to make California their home in the future after their children turned 14—and the youngest turned 14 in 2018.

Even if the court were to apply California's law of domicile, the court is persuaded that Mr. and Mrs. Tran's most settled and permanent connections were with Oregon until the summer of 2018.  Many facts support this conclusion:  Mr. and Mrs. Tran paid Oregon taxes, bank account statements were addressed to the Trans in Oregon, and Mrs. Tran had an Oregon driver's license.  However, the fact the court finds most persuasive in determining domicile is that Mr. and Mrs. Tran's minor children attended school in Oregon from September through June each year from 2011 through the conclusion of the school year ending June 2018.

The court further concludes that when Mr. and Mrs. Tran moved to California in the summer of 2018, they changed their domicile to California.  After the summer of 2018, Mr. and Mrs. Tran enrolled their children in school in California, changed their bank account address, established new relationships with a medical doctor in California, and Mrs. Tran attempted (albeit unsuccessfully) to obtain a California driver's license.

While the Trans were domiciled in Oregon, their property was not community property because Oregon is not a community property state.  Therefore, there can be no claim under California Family Code Section 1100(b) to set aside any transfer of property Mr. Tran made to Ms. Nguyen before the summer of 2018.

When the Trans changed their domicile to California in the summer of 2018, their property became quasi-community property [42] and any new property they acquired after that date was community property.[43]  Mr. Tran transferred quasi-community property or community

---

[42] Cal. Fam. Code § 125 (West) ("'Quasi-community property' means all real or personal property, wherever situated, acquired before or after the operative date of this code in any of the following ways: (a) By either spouse while domiciled elsewhere which would have been community property if the spouse who acquired the property had been domiciled in this state at the time of its acquisition. (b) In exchange for real or personal property, wherever situated, which would have been community property if the spouse who acquired the property so exchanged had been domiciled in this state at the time of its acquisition.")
[43] Cal. Fam. Code § 760 (West).

property to Ms. Nguyen during and after the summer of 2018. Therefore, the court must consider whether those transfers were a gift or made for less than fair and reasonable value and voidable by Mrs. Tran, or if those transfers were payment of a debt obligation and not voidable by Mrs. Tran. Under California law, a marital community is liable for debts incurred by either spouse before or during a marriage.[44] Use of community property to pay a community obligation is not a gift, and not voidable, under Section 1100(b).[45]

Even after he moved to California, Mr. Tran had an obligation to support the Child. Parents in California have a legal duty to support their children until they complete 12th grade or attain 19 years of age.[46] In California, "a child or spousal support obligation of a married person that does not arise out of the marriage shall be treated as a debt incurred before marriage, regardless of whether a court order for support is made or modified before or during marriage . . . ."[47] Because Mr. Tran's obligation to provide support for the Child did not arise out of his marriage with Mrs. Tran, it is treated as a debt incurred before marriage. It does not matter that a court order for child support was not entered until sometime in 2019. California Family Code Section 915 applies regardless of whether a court order for support is made.[48]

The facts presented at trial show that the only transfers of property that Mr. Tran made to Ms. Nguyen during or after the summer of 2018 were for child support for the Child. Those transfers were payments towards the community's obligation to provide support for the Child.

---

[44] Cal. Fam. Code § 910(a) (West) ("Except as otherwise expressly provided by statute, the community estate is liable for a debt incurred by either spouse before or during marriage, regardless of which spouse has the management and control of the property and regardless of whether one or both spouses are parties to the debt or to a judgment for the debt.")

[45] *In re Marriage of Leni*, 144 Cal. App. 4th 1087, 1097-98, 50 Cal. Rptr. 3d 886, 982-93 (2006) (holding that it was not an unauthorized gift for husband to use community property to support his infirm mother, because his duty of support was a community obligation).

[46] Cal. Fam. Code §§ 3900 and 3901(a) (West).

[47] Cal. Fam. Code § 915 (West).

[48] *See also Leni*, 144 Cal. App. 4th at 891-92, 50 Cal. Rptr. 3d at 1097-98 (holding that a transfer by husband to his infirm mother was not voidable under Section 1100(b) based on husband's statutory duty to provide for his mother).

Mrs. Tran cannot recover those transfers during and after the summer of 2018 under California Family Code Section 1100(b).

In the first amended complaint, Mrs. Tran also relies upon California Family Code Section 1102(a). By its terms, Section 1102 applies only to real property. The Trans presented no evidence at trial that Mr. Tran transferred any real property to Ms. Nguyen. Even if it were considered a property transfer for Mr. Tran to allow Ms. Nguyen and the Child to live in the house Mr. Tran provided from April to August 2013, that occupancy occurred well before the Trans' property became community property. Mrs. Tran cannot recover the value of that occupancy under California Family Code Section 1102(a).

### B. Claim for Civil Extortion

In its decision in the state court litigation filed by the Trans against Ms. Nguyen, the California Court of Appeal held that Mr. Tran could state a civil claim for extortion.[49] That claim allows for recission of transfers that were made based on menace—threats of confinement, of physical violence, or, as in this case, harm to character such as exposing a secret.[50] Under California law,[51] a party can rescind a contract if his consent was obtained through duress, menace, fraud, or undue influence.[52] When the contract is rescinded, the claimant may assert a claim for damages, including recovery of any amounts paid and any consequential damages.[53]

The key factual question for this claim is whether there was menace. Specifically, did Ms. Nguyen threaten Mr. Tran that she would expose the affair and the Child to Mrs. Tran unless she received payment from Mr. Tran? It was undisputed that Ms. Nguyen understood that Mr. Tran did not want his wife to know about the affair and the Child. It was also undisputed

---

[49] *Tran v. Nguyen*, 97 Cal. App. 5th at 529-31, 315 Cal. Rptr. 3d at 613-14.
[50] *Id.*
[51] Given the court's determination that Mr. Tran was domiciled in Oregon until the summer of 2018, it is not apparent that California law should apply to events in this case that took place before the summer of 2018. However, the court is addressing this claim under California law because Mr. Tran asserted it under California law and some of the alleged transfers took place during and after the summer of 2018.
[52] Cal. Civ. Code § 1689(b)(1) (West).
[53] Cal. Civ. Code § 1692 (West).

that from the time she learned she was pregnant, Ms. Nguyen asked Mr. Tran for help with the Child because Mr. Tran was the Child's father. But, as a factual matter, this court is not persuaded that Ms. Nguyen ever implicitly or explicitly threatened Mr. Tran that she would tell Mrs. Tran about the affair and the Child if Mr. Tran did not make payments to her. Ms. Nguyen did not improperly use Mr. Tran's fears that his secrets would be exposed against him to gain financial advantage. Instead, the court finds that Mr. Tran voluntarily supported Ms. Nguyen and the Child while he was still in a relationship with Ms. Nguyen.

Later, when Mr. Tran was having financial difficulties and tax problems, he stopped providing Ms. Nguyen and the Child with as much financial support as he did before. By early 2018, that support apparently slowed or stopped. At that time, Ms. Nguyen did not tell Mrs. Tran about the affair and the Child. When Ms. Nguyen needed money, the court finds her response was not to make threats—it was simply to file a request for a court order for child support in April or May of 2018. Ms. Nguyen also borrowed money from family members to pay her expenses. Mr. Tran and Ms. Nguyen ultimately entered into a voluntary agreement, drafted by Mr. Tran's lawyer, providing for Mr. Nguyen to pay child support.

Although Ms. Nguyen eventually did tell Mrs. Tran about the affair and the Child in early 2019, Ms. Nguyen did not do that for financial reasons or to carry out any threats made to Mr. Tran. Instead, the court finds that Ms. Nguyen emailed Mrs. Tran and disclosed information about the affair and the Child because Ms. Nguyen was upset that Mr. Tran had abandoned her and the Child.[54] Mr. Tran moved to California with Mrs. Tran and their children in the summer of 2018, and stopped visiting and calling Ms. Nguyen and the Child. Ms. Nguyen wanted to punish Mr. Tran for that neglect. While that was unkind, it was not extortion.

**C. Claim for Conversion**

The Trans assert a claim for conversion under California law. The Trans did not assert this claim in the state court litigation or in the original complaint—they added this claim in their

---

[54] Exh. 66, pp. 22-24, 39-40, 65-70; Exh. 67, pp. 70-74, 93-97, 113-14.

first amended complaint.  Conversion is a tort claim.[55]  The Trans appear to pursue this claim because California law allows recovery of emotional distress damages arising from conversion.[56]

It is not clear to this court that California recognizes a tort claim for conversion under the facts of this case because of California's anti-heart balm statute and the public policy underlying that statute.[57]  Prepetition, the California state trial court decided on debtor's demurrer that plaintiffs had no claims under California law for intentional infliction of emotional distress.[58]  The trial court relied upon California's anti-heart balm statute, reading the statute broadly in light of its public policy purposes.[59]  The California Court of Appeal did not disturb this ruling on appeal.[60]  Instead, under the alleged facts of this case, the California Court of Appeal acknowledged that Mr. Tran could bring a civil claim for extortion on a contract basis, but affirmed that the Trans could not assert tort claims for intentional infliction of emotional distress.[61]  Because recovery of emotional distress damages for the tort claim of conversion is generally allowed in California but the California courts read the anti-heart balm statute broadly to disallow such damages, it is unclear under the facts alleged in this case whether California law would (a) not allow a cause of action for conversion for plaintiffs at all, (b) allow only the recovery of property allegedly wrongfully converted, or (c) allow both recovery of the property allegedly wrongfully converted and emotional distress damages.

---

[55] *Welco Elecs., Inc. v. Mora*, 223 Cal. App. 4th 202, 208, 166 Cal. Rptr. 3d 877, 881 (2014).
[56] *Gonzales v. Pers. Storage, Inc.*, 56 Cal. App. 4th 464, 65 Cal. Rptr. 2d 473, 477 (1997), *as modified on denial of reh'g* (Aug. 7, 1997).
[57] Cal. Civ. Code § 43.5 (West).
[58] The California trial court's ruling is set forth in Exhibit 1 to plaintiffs' Motion for Order Granting Relief from Stay (and Establishing that No Stay Exists as to Co-Debtor) to Permit Liquidation of Pending State Court Claims, Stay of Adversary Proceedings Pending Outcome of Pending State Court Claims, Abstention from Ruling in Adversary Case Pending Outcome of Pending State Court Claims, and Setting Further Status Conference, ECF No. 14, filed Dec. 13, 2021.
[59] *Id.*
[60] *Tran v. Nguyen*, 97 Cal. App. 5th at 534-35, 315 Cal. Rptr. 3d at 617.
[61] *Id.*

Assuming, without deciding, that under the facts alleged in this case California would recognize a cause of action for conversion allowing both recovery of the property allegedly wrongfully converted and emotional distress damages, the Trans have not proven their claim. To establish a claim for conversion under California law, a plaintiff must show (1) ownership or the right to possess the property, (2) the defendant's wrongful act or disposition of that property, and (3) resulting damages.[62] With respect to the second element, the court does not find that Ms. Nguyen took money from Mr. Tran through any wrongful act.

With respect to the third element, the Trans have not shown resulting damages. In this case, there is no doubt that all the parties suffered significant emotional distress at various relevant times. But the financial support that Mr. Tran provided to Ms. Nguyen and the Child were not the cause of Mr. and Mrs. Trans' emotional distress. Based on Mr. Tran's testimony, this court finds that Mr. Trans' emotional distress was caused by his severe financial and tax problems and the consequences of his own actions, and not the actions of Ms. Nguyen. Based on Mrs. Tran's testimony, the court further finds that Mrs. Trans' emotional distress was primarily caused by the fact that Mr. Tran had an affair and the Child with Ms. Nguyen.

In closing argument, relying upon *Thompson v. Inman*,[63] the Trans asserted for the first time that they would also have a claim for conversion entitling them to emotional distress damages under Oregon law. Under Oregon law, "[c]onversion is an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel."[64] Emotional distress damages may be available if they are a common and predictable result under the circumstances.[65]

---

[62] *Welco Elecs., Inc. v. Mora*, 223 Cal. App. 4th at 208, 166 Cal. Rptr. 3d at 881.

[63] *Thompson v. Inman*, No. 6:22-CV-01665-MK, 2024 WL 2078401 (D. Or. May 9, 2024).

[64] *Mustola v. Toddy*, 253 Or. 658, 663-53, 456 P.2d 1006, 1007 (1963) (quoting Restatement (Second) of Torts § 222A (1965)).

[65] *Inman*, 2024 WL 2078401, at *3.

The Trans have not proven a claim for conversion under Oregon law. Mr. Tran voluntarily supported Ms. Nguyen and the Child while he was still in a relationship with Ms. Nguyen. Funds given as a gift are not converted under Oregon law.[66] Although Mrs. Tran did not participate in any gifts to Ms. Nguyen, while Mr. Tran was domiciled in Oregon he had the legal right to control the funds in the joint bank account and the disposition of the BMW X3 in his name. Later, after the Trans changed their domicile to California, Mr. Tran paid only child support to Ms. Nguyen. Because Mr. Tran had an obligation to support the Child, payments to support the Child were not converted funds. Equity would not justly require the return of funds paid to satisfy a legal obligation to support a minor child.

### D. Claim to Establish a Constructive Trust

The Trans assert a claim for constructive trust, alleging that Ms. Nguyen has taken money from them through her wrongful acts and that the Trans are entitled to a constructive trust over the money. Plaintiffs have not proven this claim for two reasons. First, the court does not find that Ms. Nguyen took money from Mr. Tran through any wrongful act. Second, the Trans cannot establish a right to a constructive trust in this case. A constructive trust is an equitable remedy, which is inchoate until it is imposed.[67] If that remedy was not imposed prepetition, it is subject to the trustee's strong-arm powers and status as a bona fide purchaser.[68] On behalf of the estate, the trustee's rights to administer assets of the estate takes priority over any interest the Trans may have in establishing a constructive trust.[69] To the extent Ms. Nguyen still retained any money that Mr. Tran gave her as of the petition date,[70] the trustee, not the Trans, would have rights to it.

---

[66] *Sasser v. DeLorme*, 56 Or. App. 630, 632-34, 642 P.2d 1192, 1193-94 (1982).

[67] *Airwork Corp. v. Markair Express, Inc. (In re Markair, Inc.)*, 172 B.R. 638, 642 (9th Cir. BAP 1994).

[68] *Chbat v. Tleel (In re Tleel)*, 876 F.2d 769, 771 (9th Cir. 1989); *Markair*, 172 B.R. at 642.

[69] *Id*.

[70] As of the petition date, Ms. Nguyen did not actually have the $559,218.15 over which the Trans seek a constructive trust. According to her bankruptcy schedules, on the petition date Ms. Nguyen had only $10 in cash, $2,480 in checking and savings accounts at one bank, and $1,400 in checking and savings accounts at another bank. Exh. 25, p. 15 of 41. The Trans have not traced the source of those funds to any amounts that Mr. Tran provided to Ms. Nguyen.

### E.  Claim for Receiving Stolen or Extorted Property

The Trans assert a civil claim for receiving stolen or extorted property under California law.  Under California law, "[e]very person who buys or receives any property that has been stolen or that has been obtained in any manner constituting theft or extortion, knowing the property to be so stolen or obtained, or who conceals, sells, withholds, or aids in concealing, selling, or withholding any property from the owner, knowing the property to be so stolen or obtained, shall be punished by imprisonment in a county jail for not more than one year, or imprisonment . . . ."[71]  California recognizes a civil cause of action for anyone injured by a violation of this criminal law.[72]

Plaintiffs have not proven this claim.  As set forth above, the court finds that Ms. Nguyen did not extort money or property from Mr. Tran.  While Mrs. Tran may believe property was wrongfully taken from her and provided to Ms. Nguyen, Mrs. Tran has not proven that Ms. Nguyen knew that any money or property she received was stolen or taken in violation of any rights of Mrs. Tran.

### F.  Nondischargeability Claims

The Trans assert that their claims against Ms. Nguyen are nondischargeable.  For the reasons set forth above, the court finds that the Trans have not proven their underlying claims. The Trans have also not established that the claims they alleged should be nondischargeable.

First, the Trans assert that their claims should be nondischargeable under 11 U.S.C. § 523(a)(2)(A).  This section precludes discharge of debt for money, property, or services, to the extent obtained by false pretenses, a false representation, or actual fraud, other than a financial statement.[73]  A creditor must prove five elements to establish this claim: (1) debtor made representations (2) that she knew at the time were false (3) with the intention and purpose of deceiving creditor, and (4) that creditor relied on such representations (5) and sustained loss and

---

[71] Cal. Pen. Code § 496(a) (West).
[72] Cal. Pen. Code § 496(a) (West).
[73] 11 U.S.C. § 523(a)(2)(A).

damage as a proximate result.[74]  The Trans alleged this claim asserting that Ms. Nguyen made

extortionate demands and false promises not to disclose the affair and the Child to Mrs. Tran.

At trial, it was undisputed that the sole contact between Ms. Nguyen and Mrs. Tran was

the January 8, 2019, email.  Although Ms. Nguyen misrepresented her identity to Mrs. Tran by

using an alias when sending that email, there was no evidence that Mrs. Tran relied on, or was

damaged by, Ms. Nguyen's misrepresentation about her identity.  Mrs. Tran was upset by fact

that the email caused her to learn the truth about her husband's affair and the existence of the

Child—not by the fact that "Tina Duong" was actually Ms. Nguyen.

As the court found above, Mr. Tran did not prove that Ms. Nguyen made extortionate

demands to him.  Mr. Tran also did not prove that Ms. Nguyen made false representations to

him.  The only promise that Mr. Tran proved Ms. Nguyen made to him was a confidentiality

provision in the voluntary child support agreement that Mr. Tran and Ms. Nguyen reached in

2018.  While the contract itself was not in evidence, from the testimony at trial the court

concludes that both Mr. Tran and Ms. Nguyen breached that contract.  Mr. Tran did not make all

the payments he promised to make, and Ms. Nguyen did not maintain confidentiality.  However,

a mere breach of contract is insufficient to establish a basis for nondischargeability under Section

523(a)(2)(A).[75]  Therefore, the Trans have not proven their claim under Section 523(a)(2)(A).

Second, the Trans assert that their claims should be nondischargeable under 11 U.S.C.

§ 523(a)(4).  This section precludes discharge of a debt for fraud or defalcation in a fiduciary

capacity.[76]  Whether a debtor is a fiduciary and whether his actions constitute defalcation are

governed by federal law.[77]  To establish liability under this provision, a creditor must prove:

(1) there is an express trust; (2) the debt is created by fraud or defalcation; and (3) the debtor

---

[74] *Turtle Rock Meadows Homeowners Ass'n v. Slyman (In re Slyman)*, 234 F.3d 1081, 1085 (9th
Cir. 2000); *Deitz*, 760 F.3d at 1050; *Younie v. Gonya (In re Younie)*, 211 B.R. 367, 373 (9th Cir.
BAP 1997).
[75] *Daily v. Garrett (In re Garrett)*, BAP No. EC-16-1265-HKuB, 2018 WL 4057228, *4 (9th Cir.
BAP Aug. 24, 2018), aff'd, 800 F. App'x 527 (9th Cir. 2020).
[76] 11 U.S.C. § 523(a)(4).
[77] *Mele v. Mele (In re Mele)*, 501 B.R. 357, 363 (9th Cir. BAP 2013).

acted as a fiduciary to the creditor when the debt was created.[78]  For a debtor to be a fiduciary

under Section 523(a)(4) the fiduciary relationship must arise from an express or technical trust

that exists before the alleged defalcation and without reference to the alleged wrongdoing that

caused the debt.[79]  The Trans alleged this claim asserting that Ms. Nguyen held funds in trust for

the Trans' marital estate.  They assert this trust arose under California law when funds allegedly

were wrongfully transferred from the Trans' marital estate to Ms. Nguyen without Mrs. Tran's

consent.  The Trans did not allege or seek to prove that Ms. Nguyen was a fiduciary for an

express or technical trust, and there was no evidence that any such trust existed before and

independent of the alleged defalcation.  Therefore, the Trans have not proven their claim under

Section 523(a)(4).

Finally, the Trans assert that their claims should be nondischargeable under 11 U.S.C.

§ 523(a)(6).  This section precludes discharge of a debt for willful and malicious injury by the

debtor to another entity or to the property of another entity.[80]  A creditor must prove both

willfulness and maliciousness to establish this claim.  Willfulness requires that the debtor "has a

subjective motive to inflict injury or when the debtor believes that injury is substantially certain

to result from his own conduct."[81]  Maliciousness requires: (1) a wrongful act, (2) done

intentionally, (3) which necessarily causes injury, and (4) is done without just cause or excuse.[82]

The Trans alleged this claim asserting that Ms. Nguyen intended to harm the Trans.  Here, the

court finds that Ms. Nguyen acted willfully—there is no doubt she intended to punish Mr. Tran

by disclosing the affair and the existence of the Child to Mrs. Tran.  However, given California's

anti-heart balm statute and that California law does not recognize a claim for intentional

infliction of emotional distress under the circumstances, the court does not find that this was a

---

[78] *Otto v. Niles (In re Niles)*, 106 F.3d 1456, 1459 (9th Cir. 1997), *abrogated on other grounds by Bullock v. Bankchampaign, N.A.*, 569 U.S. 267, 274, 133 S.Ct. 1754, 1759-60 (2013).
[79] *Lewis v. Scott (In re Lewis)*, 97 F.3d 1182, 1185 (9th Cir. 1996).
[80] 11 U.S.C. § 523(a)(6).
[81] *Ormsby v. First Am. Title Co. of Nev. (In re Ormsby)*, 591 F.3d 1199, 1206 (9th Cir. 2010).
[82] *Id.* at 1207.

wrongful act under the law and the Trans have not proven that Ms. Nguyen's conduct was malicious.  Therefore, the Trans have not proven their claim under Section 523(a)(6).

### Conclusion

For the reasons set forth above, the court concludes that the Trans have not established their state law claims or their claims for nondischargeability under 11 U.S.C. § 523.  This court will enter judgment in favor of plaintiffs on their claims under 11 U.S.C. §§ 727(a)(3) and 727(a)(5) and for defendant on the plaintiffs' remaining claims.

# # #